UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

**FILED**

2005 JAN 26  P 2: 36

U S DIST. COURT CLERK
EAST DIST. MICH.
BAY CITY

LINDA ROSE, JENNIFER CRADIT,
SYLVIA DENISE BRADDOCK, LISA
RENEE BRANDIMORE, DWAYNE
BUTTERFIELD, BOBBIE WAYNE
CARTER, DANIEL WRAY CLAYTON,
JOSHUA FULLER, NICHOLAS ANTHONY
GILES, WILLIE LOUIS HENDRICKS,
TANISHA RAMON JOHNSON, ROBERT
ALLEN KELSEY, SUE ANN LETTERMAN,
DONNA LYNN QUARLES, GREGORY LOUIS
SCHULTZ, AMANDA RAE SHINAVER,
DWAYNE ALANN SIMMONS, ROBIN RENEE
THOMAS, JOSHUA ALLEN WEIGANT,
JUSTIN ANDERSON, CRAIG MASON, and
MATTHEW STARKWEATHER,

Case Number 01-10337-BC
Honorable David M. Lawson

Plaintiffs,

v.

SAGINAW COUNTY, SAGINAW COUNTY
SHERIFF'S DEPARTMENT, MUNICIPAL
GOVERNMENTAL ENTITIES, CHARLES BROWN,
and OFFICERS JOHN DOE, and JANE DOE,
(in their individual capacity), jointly and severally,

Defendants.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, GRANTING
IN PART AND DENYING IN PART DEFENDANTS'
MOTION TO DISMISS OR FOR SUMMARY JUDGMENT, AND DENYING
PLAINTIFFS' MOTIONS TO AMEND COMPLAINT TO ADD PARTIES, ADD
EXPERT WITNESS AND FOR A PRELIMINARY INJUNCTION**

The plaintiffs in this case are twenty-two individuals who claim that they were subjected to

an unconstitutional policy by officials at the Saginaw County jail when they were held as pretrial

detainees at various times between May 1999 and December 2001. The Saginaw County sheriff

instituted a policy and practice of housing uncooperative and disruptive detainees in administrative segregation cells; and jail personnel would take all of the clothing from such detainees so that they were naked for the time that they spent in administrative segregation. All of the plaintiffs were subjected to this treatment, and some of them allege that they were viewed while naked by jail personnel and inmates of the opposite gender. The defendants have filed a motion for judgment on the pleadings or alternately for summary judgment, and the plaintiffs have filed a cross motion for partial summary judgment. The Court heard arguments from counsel in open court on March 16, 2004, and the matter is now ready for decision. The plaintiffs also have filed additional procedural motions.

The Court finds that the County's policy of confining detainees without any clothing or covering whatsoever is unconstitutional; the individual defendants are entitled to qualified immunity from the federal claims; all defendants are entitled to governmental immunity from the state law claims; the plaintiffs have not established facts sufficient to withstand summary judgment on their claim under the state civil rights act; and the plaintiffs' recently-filed procedural motions and motion for a preliminary injunction lack merit. The Court, therefore, will grant in part and deny in part the plaintiffs' motion for summary judgment, grant in part and deny in part the defendants' motion for summary judgment, and deny the plaintiffs' procedural motions and motion for a preliminary injunction.

I.

This case arises from the alleged mistreatment of twenty-seven plaintiffs while they were in custody at the Saginaw County Jail. The jail is a detention facility operated by Saginaw County to detain arrestees awaiting trial and offenders sentenced to custodial terms of one year or less. The

-2-

facility holds 525 people at maximum capacity and receives between forty and sixty individuals per day from several law enforcement agencies within Saginaw County; it takes in between 12,000 and 14,000 people per year. The defendants estimate that ten percent or fewer of the detainees are female.

The plaintiffs were processed through the jail between May 22, 1999 and December 29, 2001. During this time over 30,000 people were processed through the jail. Each of the plaintiffs was in some way uncooperative or disruptive during the booking process and therefore was subjected to the jail administrator's policy of being placed in administrative segregation. The jail administrator described the policy as follows:

> That if an individual, not just because they're disruptive or disorderly, if they violate the security measures of that jail, or pose harm to themselves or others, the correction officer could request from the sergeant permission to escort the person to segregation administration.

Defs.' Mot. for Summ. J., Ex. A, Dep. of William Gutzwiller at 33.

Whenever a person is placed in administrative segregation, it is the policy and practice of the Saginaw County jail personnel to remove the person's clothing and put the detainee in the segregation cell naked. A detainee's clothes are forcefully removed if he or she does not voluntarily comply with jail personnel orders to remove the clothes prior to entering the administrative segregation cell. Saginaw County deputy sheriff sergeant Gary Van Riper testified: "Clothes would be removed from a person if they did not want them taken off because that's what the ruling from the command or the policy, however you want to look at it. I guess, stated, that they would go in there with no clothes on, yes." Defs.' Mot. for Summ. J., Ex. B, Dep. of Gary VanRiper at 21. The record evidence discloses that only a detainee who disrupts the security of the jail, disrupts the

-3-

orderly operation of the jail, or is assaultive towards themselves, another detainee, or staff, is placed in administrative segregation. However, the policy of removing clothes is applied to those in administrative segregation without regard to the nature of the offense for which they are detained and in the absence of any individualized suspicion of drugs, weapons, contraband, or threat of suicide. None of the plaintiffs were placed in the jail's general population or on suicide watch.

If a detainee failed to comply with orders to remove his or her clothing prior to placement in the administrative segregation cell, limited force was administered to remove the clothes. "[O]nly the force necessary to do it" was used. *Ibid.* Male officers would assist in the removal of a female detainee's clothes if the female detainee threatened the female officer's safety. *Id.* at 22 (stating that "[t]he only time a male would be present when a female was taking off her clothes is if she became violent to the point where the female officer's safety was in danger").

According to the defendants, the naked confinement policy was formulated in August 1996 following an incident that ended in the suicide of a detainee who had been placed in administrative segregation. Apparently, the detainee, dressed in a standard-issue orange jail jumpsuit, was placed in the administrative segregation cell and left unobserved and unattended for several hours. The defendants report that this detainee wedged his jail uniform into the tiny space between the cell door and the door frame and hanged himself. About three months later, another inmate purportedly vandalized one of the direct observation cells and rendered it unusable. The defendants' response to these events was the policy that called for disruptive detainees to be placed in administration cells and mandated that "any inmate placed into these cells would be placed into them without clothes." Defs.' Mot. for Summ. J., Ex. D, Defs' Ans. to Pls.' First Interrog. and Second Request for Prod. of Docs. at No. 16 (italics deleted).

-4-

The defendants' policy required a detainee to remain in administrative segregation until such time that he or she no longer posed a threat to himself or herself, others, jail staff, or the secure operations of the jail. *See* Defs.' Mot. for Summ. J., Ex. C, Dep. of Sheriff Brown at 49. (asserting that "[i]t's taking away the chance that that person may hurt themselves or somebody else, and once they sober up or once they become cognizant of what they're doing, you may have saved that person from tremendous injury").

The parties have submitted incident reports from the jail that recount the circumstances under which jail personnel decided to place the various plaintiffs in administrative segregation:

> *Linda Rose:*
> At the above date and time [1/27/01], female listed above was housed in 1IOC2 and began pounding and kicking the door. R/O notified S/C. S/C instructed staff to place female in 1ISC1. Officers Onweller, Worden, D. Brown and Kolb placed subject in Seg. without incident. Property taken and watchsheet placed.

Pls' Ex. 14 at 35.

> *Jennifer Cradit:*
> On July 17, 1999 at 0230 hours this S/C was in intake when the city P.D. brought in a disorderly female named Cradit, Jennifer . . . Cradit was placed in observation cell #2 after stating "fuck you" to all of the staff present in intake. While in this observation cell #2 Inmate Cradit pounded and kicked the glass window and door.
>
> This R/O and other staff tried to calm Inmate Cradit down to no avail. Cradit would only state that she wanted to use the phone and then would tell the whole staff to "fuck off."
>
> Cradit then proceeded to stuff toilet paper in the toilet and flush it until it flooded over. This S/C and Deputies Brown, Kolb, and Thom entered the cell to remove the paper. This was done without incident.
>
> Two minutes later Inmate Cradit was placing her jean shorts in the toilet and flooding the cell again. Again, these officers entered the cell to remove the shorts and to place Cradit in an administrative segregation cell as she was taking off her clothing and disrupting the jail procedures. Cradit was given every opportunity to calm down.

As these officers attempted to remove Inmate Cradit she began to resist and would not let us remove her sandals and jewelry. During this struggle Inmate Cradit attempted to bite this S/C, S/O Miller and Deputy Brown. Inmate Miller was bitten on his right ring finger, and this S/C was scratched on the left wrist. Deputy Kolb was scratched on the left wrist. Inmate Cradit was handcuffed and her jewelry removed.

Inmate Cradit was carried to the administrative segregation cell in her underwear, t-shirt, and bra. The remaining clothing was removed by S/O Allen in the administrative segregation cell.

Inmate Cradit was placed in the administrative segregation cell due to her constantly kicking and pounding the glass, flooding the cell, verbally assaulting the staff, and removing her clothing.

It should also be noted that Inmate Cradit continuously made verbal threats toward all of the staff present. Cradit threatened to kill all of the officers "When she sees us in the streets."

This S/C, S/O Allen, S/O Miller, S/O Bates, Deputy Kolb, Deputy Thom, Deputy Brown, and Nurse Sharrow were present during the incident . . . Cradit was placed under a 15 minute watch . . . .

Pls.' Ex. 14 at 9.

*Sylvia Denise Braddock:*
At approximately 2330 City PD brought in a disorderly which R/O and C/O Batts and Classification Officer Nellett and Galsterer responded. Through our attempt to search Inmate Braddock in which she was uncooperative. C/O Marquez notified S/C and S/C advised place her in Admin Cell ISC2. Placed Inmate Braddock in Admin Cell without further incident.

Pls.' Ex. 14 at 2.

*Lisa Renee Brandimore:*
On 5-22-2000 at approximately 1900 hours R/O arrived for work. Inmate Brandimore was in cell 1IOC2. She was hitting and kicking cell door. R/O opened the cell door and told Inmate to stop hitting the door. Inmate stepped out of the cell door. R/O asked Inmate to step back into cell. Inmate refused and had to be escorted into cell. Inmate refused to stop hitting and kicking the door. Officers Robins, Nellett, and Blondin escorted Inmate to 1ISC1. Inmates [sic] clothing was removed and bagged . . . A watch sheet was posted and shift commander was notified. Inmate was brought in by the Saginaw City PD for OUIL. Inmate blew a .27, .30., .25 blood

-6-

alcohol content on the breath analyzer. Inmate hit cell wall for approximately 10 minutes. Afterward she calmed down and no further incident to report. S/C; Brandimore was questioned by the R/O as to how much she had to drink? S/C had to respond to her old address in the past as a member of James Twp Fire Department[.] She is [] 48. Brandimore has no idea how much she had to drink. Brandimore was changed back into her clothing by S/O Nellett and then finished the intake process.

Pls.' Ex. 14 at 3.

### Dwayne Butterfield:

On the above date [12/8/01] at 0200 SPD brought in Inmate Butterfield for DWLS warrant. Inmate Butterfield was very disorderly and intox. Staff placed Inmate in 11OC3 to let him calm down. Inmate was warned several times not to pound on the door and window. Inmate Butterfield continued to do so, R/O along with Dep. Anderson, and C/O's Roat and Riefenbaugh escorted Inmate to 11OC2. Inmate Butterfield started to remove his clothing but then stopped and clinched his riht [sic] fist. At this point staff restrained inmate and removed the rest of his clothing and jewelry . . . S/C Demand this inmate is highly intoxed [sic] this Inmate will be staying in admin seg cell. This Inmate is still yelling some 3 hours later and it looks like he needs a few more hours.

Pls.' Ex. 14 at 4.

### Bobbie Wayne Carter:

On the abpve [sic] date [2/12/01] city brought Inmate Carter, Bobbie to jail. Inmate Carter began kicking the glass in IOC4. He was moved to the cuff tank with force because he refused to be moved. When in the cuff tank he kept kicking the door. He was moved to 11OC1 per S/C. In the tank he began to resist and kick. He was sprayed. His clothing was removed . . . S/C was informed of same.

Pls.' Ex. 14 at 5.

### Daniel Wray Clayton:

At the above date [5/22/99] and time [3:30], Birchrun PD brought in the above subject for two misd charges. Once subject arrived in the intake area, subject became verbal and out of control w/ officers. R/O along w/ C/O's Weber, Tohm [sic], Miller, Kolb and the Birchrun Officers escorted the subject to 11SC2.

Once in the cell, R/O asked Birchrun Officers to exit the cell and County Officers would take over. Subject was asked to get on his knees and remove clothing. Subject refused and was placed on his stomach by Officers and clothing removed by officers.

During the take down of subject, subject tried to resist. PPCT was applied to subject to bring subject under control. Subject received one strike to the common peroneal area by R/O. S/C notified.

Pls.' Ex. 14 at 8.

*Joshua Fuller*:
At the above date [11/24/00] and time [3:20], R/O told Fuller who was lodge in 11OC4 to stay off the door. S/C informed this Officer that Fuller was warned twice prior. Moments later, Fuller started pounding on the door again. S/C instructed intake staff to place Fuller in 11SC1.

Fuller was escorted to 11SC1 from 11OC4 without a problem. Once Officers reached 11S1, Fuller was asked by C/O Onweller to get on his knees and remove his clothing. Fuller told Officer Onweller that he wasn't going to get on his knees. Fuller was given one burst of OC spray and was taken to the ground by R/O.

All clothing and property removed from Fuller . . . .

Pls.' Ex. 14 at 13.

*Nicholas Anthony Giles*:
On 8-7-99 at approximately 0220 Inmate Giles was brought in by Bridgeport PD. Inmate came in peacefully but as soon as he was put in cell 11OC4 Inmate became hostile. Inmate began kicking and hitting the door to the cell. R/O instructed Inmate to exit the cell door and walk toward the end of the hall. Inmate refused to walk so C/O Huiskens, Bohls, Hanafin, Smith and R/O escorted Inmate. Inmates [sic] clothing was removed . . . .

Pls.' Ex. 14 at 14.

*Willie Louis Hendricks*:
While working intake Inmate Hendricks, who was placed into 11OC3, started knocking on the door requesting to be moved into a different cell. R/O informed subject to sit down and not to hit or kick the door Inmate refused R/O's instructions and hit the door a second time. R/O informed subject to sit down and not to hit or kick the door Inmate refused R/O's instructions and hit the door a second time. R/O and Officers Huiskens, Bohls, Anderson, and Hanafin escorted Inmate to 11SC2. Once at the cell the Inmate was asked to remove his clothing. While complaining started to remove his clothing. R/O instructed Inmate to put his clothing into the bag which R/O was holding. Inmate took his sweatshirt and threw it at R/O hitting R/O in the head. R/O along with other Officers helped remove his other clothing. Inmate caused no further incident. His clothing was logged and put into locker #50. S/C

-8-

was notified and watch sheet was posted due to the high breath test. Inmate was brought in by Officer Kratz from Buena Twp. PD for OUIL. He blew a .27 on the BAC DATA Maters . . . .

Pls.' Ex. 14 at 16.

> *Tanisha Ramon Johnson:*
> On 7-28-99 at approximately 2200 hours Inmate Johnson was brought from 1IOC1 to the intake counter. Immediately Inmate Johnson became hostile toward R/O and staff. Inmate refused to sign any paperwork and started name calling toward R/O. R/O instructed Inmate several times to sit up on the couch, Inmate refused. C/O Kutchinski and C/O Nelson escorted Inmate Johnson to 1ISC1. Inmates [sic] clothing was removed and taken to female dorm to be put in a locker. Shift Commander was notified and a watch sheet was placed.

Pls.' Ex. 14 at 17.

> *Robert Allen Kelsey:*
> This Officer was in intake, when the Saginaw County Police, brought in Inmate Kelsey. At the time was hog-tied, but was not acting violent, and after restraints were removed, Inmate Kelsey was placed into 1IOC4 as, at the time we had no other observation cells open, and his action did not warrant placing him into 1ISC1.
>
> While in 1IOC4 Inmate Kelsey kicked the cell door, several times demanding his immediate phone call. Inmate Kelsey appeared intox or high, or both, as he would quiet down for awhile and then become hostile.
>
> At 2250 hrs, these Officers noticed Inmate Kelsey was standing over Inmate (Roosevelt Daniels) and it appeared that he was making some kind of threats. Staff responded and Inmate Kelsey had to be forcefably [sic] removed from the cell. As these Officers were doing so, other inmates demanded his removal, as he was trying to start a fight, and had something in his hand using it like a weapon.
>
> Inmate Kelsey did have something in his hand, and was holding it in a threatening manner. Inmate Kelsey resisted staff's orders and went to square off them with this possible weapon, and was taken to the floor immediately for everyone's safety.
>
> Inmate Kelsey was moved to 1IOC1 (which was now available) and durin [sic] move and key chain was removed, from this Inmate's left hand. This key chain has a 30.06 shell & bullet on it, and Inmate Kelsey had in his hand as one would hold a knife, if they would be using it as a weapon.
>
> Inmate Kelsey was search again, and nothing else was found.

Around 2255 hrs; Inmate Kelsey had to be moved again. For about 5 minutes Inmate Kelsey continued to kick the cell door, hard enough to move it and it appeared that he would damage same, even after being told to stop his actions. This Officer went to the cell, and ordered Inmate Kelsey to come out, and Inmate Kelsey immediately backed up and went into a fighting stance, fist closed and up in assaultive position this officer ordered Inmate Kelsey to come out of the cell, but he refused, stating "you want me, come and get me" this Officer entered the cell, and removed Inmate Kelsey, and with the least force necessary to do so. This Officer escorted Inmate Kelsey to 1ISC2 and staff then had Inmate Kelsey remove his clothing.

Staff advised during this time, Inmate Kelsey advised that "He was with the FBI and we need to treat him better." Staff advised that when Inmate Kelsey was totally undressed, they found a lighter hidden in his underwear, and Inmate Kelsey did square off on staff, as he was refusing to remove his watch. This was done by a show of force, and no further problems occured [sic].

As soon as staff, closed the cell door, Inmate Kelsey immediately began assaulting the door.

Inmate Kelsey is in on a Chapter #4 ·· and could be released as soon as he can calm down enough to be processed.

Pls.' Ex. 14 at 19.

> *Sue Ann Letterman*:
> On the above date [9/21/99] at approx 0140 hrs, R/O pulled out Inmate Letterman to be booked. Subject was very uncooperative and argumentative throughout this process. R/O gave numerous chances for her to comply with the process, but Inmate was still uncooperative and demanding. Inmate also made comments saying that she hopes we would get "bomb." At this time, R/O had to escort Inmate back into 1IOC2. C/O Tohm [sic] and S/C were present during this incident.

Pls.' Ex. 14 at 20.

> C/O Nellett was called to intake reference a disorderly female. Sue Letterman was throwing toilet paper, screaming and making threats to C/O Brown while she was in IOC2. Subject was taken to administrative segregation cell and was told to remove her clothing. Nurse Stella, C/O Miller, C/O Marquez and C/O Nellett were in the room with her. Subject was given numerous chances to remove her clothing and jewelry by herself. Clothing was removed w/o incident or force . . . .

Pls.' Ex. 14 at 22.

-10-

*Donna Lynn Quarles*:

On 9-3-2000 at approximately 0315 hours Inmate Quarles was brought in by Troopers Korzek and Campbell from the MSP Bridgeport Post. Inmate was taken to the breathalyzer room for an alcohol test. Inmate immediately started being loud and obnoxious toward all officers (state and county). After her breath test Inmate was brought to booking counter to be processed. As R/O starting asking Inmate questions for booking Inmates started giving R/O a difficult time (Inmate wouldn't give SSN #). R/O finally finished booking and sent to the next station (picture and prints). While Inmate was being pictured R/O heard Inmate disrespect S/C by asking him if he wanted some popcorn and donuts. Inmate was asked to sit on the couch until the finger print machine was ready for her prints. While Officer Bohls was working on setting up the machine for prints the Saginaw City PD brought in James Woolfolk who was acting very disorderly. R/O and several other officer [sic] responded to that. After Woolfolk was calmed down R/O noticed that Inmate Quarles had been escorted to cell 1ISC2. Since Inmate was a female and not fighting with Officers Blondin and Kutchinski R/O just stood in the hall listening for Inmate to become hostile. Officers were able to remove clothing and exit the cell without incident. Inmate was lodged for OUIL, her blood alcohol content was .16. Inmate caused no further incident.

S/C; I was present with S/O Blondin and Trooper Campbell with Quarles in the classification/breath room. Qurles [sic] was having everything explained to her 3 and 4 times. Quarles refused 2 times and then Trp Campbell got a reading of her test .16.

Quarles was escorted out to the intake area and Deputy Houge started the intake/booking questions. Quarles didn't want to give her SS# out loud and wanted Houge to remove her keys from the property bag. Quarles was informed that she was on tape and she stated "I don't give a fuck what I'm on.["] This S/C informed her that nobody was making fun of her and that she just needed to fill the forms out.

S/O Bohl requested that Quarles get up off from the couch and come over to get [sic] he [sic] photo's [sic] taken. Boyl was stopped to [sic] many times by this Inmate as she wanted to see her photo first. S/C questioned Quarles if she had her own hair or a wig. Quarles said something smart why done [sic] you check my hair. I informed her I would have somebody check it as it is policy to check to see if something is in it.

Bohl was done with the photo's [sic] and was starting to take her prints when he departed intake for the sallyport to assist the city. Quarles was informed to sit down and wait until they got back to her. Quarles got off the couch and walked over to the phone by Pams [sic] work station to see what was going.

Quarles was instructed to sit down by this S/C and she informed me that I'm not her dad so "Shut the fuck up and I don't have to sit down do you want some popcorn or donuts.["] S/C requested that she be escorted to admin seg cell until she come down off her intoxed state of mind.

Pls.' Ex. 14 at 26-27.

> *Gregory Louis Schultz*:
> On the above date [6/14/00] Carrollton lodged Inmate Shultz [sic] for OUIL, subject was disorderly when placed in the cell. Subject finally started to pound on the door of IOC4 and being insolent towards booking staff. Subject started calling staff "Mother fuckers" and "Fuck you assholes."
>
> R/O then contacted S/C and was informed to take subject to admin seg. Dep Kolb then called for assistance from tower. C/O Miller and Dep Brown came down to assist. R/O along with Dep Kolb, Brown and C/O Miller took subject to admin. seg. Inmate Schultz was cooperative up to the point of taking off his underwear. Subject was again told to take off his underwear but refused. R/O then used one burst of guardian stream to the face of the subject. Inmate Schultz's underwear was then taken and S/C notified of use of spray . . . .

Pls.' Ex. 14 at 36.

> *Amanda Rae Shinaver*:
> On the above date [9/1/00] and time [6:26], R/O pulled Amanda Shinaver from 1IOC2 for processing. Shinaver was brought in by the City PD for OUIL.
>
> While in the process of booking Shinaver, Shinaver became upset w/ intake staff because of her present situation. She was trying to throw blame on the county for the city arrest.
>
> R/O was trying to explain to her that we were not responsible for her arrest but she just wanted to be insolent and argue w/ this R/O. R/O told Officer Brown to lock subject back down to her present state of mind. At this time, Shinaver gave R/O the finger and spit on R/O.
>
> Shinaver was pulled away from the counter by Officer Brown at which time she began flailing her arms in a threatening manner. Officer Nellett then arrived to help Officer Brown bring Shinaver under control. Still having problems with Shinaver R/O assisted C/O's Brown and Nellet [sic] w/ handcuffing Shinaver. S/C was notified and intake staff was given permission to place Shinaver in 1ISC1. Clothing and property were removed by C/O Nellet [sic] w/ assistance from Officers Brown, Miller and R/O . . . .

Pls.' Ex. 14 at 37.

-12-

*Dwayne Alann Simmons*:
On 10-22-99 at approximately 0320 Inmate Simmons was brought to the booking counter for processing. Inmate started becoming disorderly and uncooperative. Inmate told R/O to "Fuck you and lock me back into the cell." R/O along with Deputy Huiskens and C/O Bates escorted Inmate to ISC1 . . . . SC/; This Inmate knows it all and can sit in Admin Seg Cell until he sleeps off his intox buzz.

Pls.' Ex. 14 at 39.

*Robin Renee Thomas*:
On the above date [12/25/01] and time City PD Officers Rocha, Ifill and Teneyuque brought in a female subject by the name of Robin Thomas. As R/O was walking the subject back to 1ISC1 to be searched, subject stopped and refused to walk. R/O and Officer Ifill attempted to walk her back and subject pushed back.

Officers Rocha and Teneyuque were behind R/O and Officer Ifill and assisted in trying to get subject into 1ISC1.

Upon entering 1ISC1 subject braced herself against the door jam and would not enter the cell.

Officers Rocha and Teneyuque took subject to the ground after several requests by R/O and the other officers to let go of the door.

Subject was held to the floor until S/C was contacted and advised of the situation. Subject remained combative while on the floor.

S/C advised to place subject in 1ISC1.

Clothing and jewelry was taken. *Underpants was left w/ subject and white gown was given.* Watch sheet placed on subject.

Pls.' Ex. 14 at 43 (emphasis added).

*Joshua Allen Weigant*:
While taking money at window, R/O heard loud voices coming from the breathalizer [sic] room and then heard what sounded like a fight R/O did call for assistance. Subject then was taken back to seg cell.

Pls.' Ex. 14 at 47.

-13-

*Justin Anderson*:
On 9-30-2000 at approximately 0210 hours Inmate Anderson was brought into jail by Officer Neilson from Frankenmuth PD. Inmate immediately started being verbally abusive toward arresting officer.    Officer Neilson took Inmate back to the breathalyzer room for a test. Afterward Inmate was brought to booking counter to be booked. Inmate continued to [be] abusive not only to Officer Nielson but to jail personal [sic]. R/O started to book Inmate, during the process Inmate responded to Officer Blondin to stop fucking staring. Then Inmate called Officer Nellet [sic] if she was ignorant. R/O along with Officer Bohls, Anderson, and Smith escorted Inmate to ISC1. His clothing were removed . . . . S/C was notified and watch sheet was posted. Inmate was brought in for OUIL. Subject blew a .10 BAC.

Pls.' Ex. 14 at 1.

*Craig Mason*:
On above date [10/8/00] and time [5:39] City P.D brought in above Inmate Mason, Craig (083600) from hospital were they had to go for a blood draw. When P.D. arrived in intake Inmate stayed louid [sic] and saying that we had to do as he said. Inmate was seen by med for his eye that was bothering him. Inmate was placed in IOC4 were he started to knock on the door and kick. Inmate acted like this for a few hours after this time R/O called S/C for OK to place Inmate in ISC cell. Dep. Brown opened door to IOC4 and informed Inmate to seat and wait his turn or he will be placed in ISC cell. Inmate started to push on door trying to get past Dep. Brown at this time R/O went to IOC 4 to help put Inmate back in cell. Officers had to remove another Inmate in ISC so Officers could place Mason in ISC1. Inmate was escorted to ISC1. Once in ISC1 Officer administrative segregation unit.

Asked Inmate to remove clothing Inmate would not so Officers removed clothes. R/O placed clothes in locker and hang watch sheet. S/C was called after Inmate was placeds [sic] in cell.

Pls.' Ex. 14 at 23.

*Matthew Starkweather*
On 6/11/2000 at approximately 0210 hours inmate was lodged into jail by Frankenmuth PD for OUIL. Inmate refused a breathalyzer and reluctantly had blood drawn. Inmate was then put into cell IOC4. Approximately 0245 inmate was then brought to the booking counter for booking processing. Inmate was asked to place his left arm on the counter for a wrist band to placed on. Inmate refused to give his left arm. Inmate was asked a second and htird time to give his left arm. Inmate replied "No". Inmate was the escorte [sic] to ISC2 by R/O, and Deputy Anderson.

Inmates [sic] clothing was removed and placed into a bag.  S/C was notified and a watch sheet was posted.  Inmate refused the breathalyzer but blew a .26 on the PBT.

Pls.' Ex. 14 at 40.

The plaintiffs filed a complaint in this Court on October 19, 2001 alleging a violation of their constitutional rights against unreasonable searches and seizures under the Fourth Amendment via 42 U.S.C. § 1983, as well as claims sounding in gross negligence, invasion of privacy, assault and battery, intentional infliction of emotional distress, and gender discrimination under the Michigan Elliot-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101, *et seq.*  The complaint has been amended six times, mostly to add or delete plaintiffs.

During various case management and status conferences, the parties discussed a mechanism for resolving the disputes of the several plaintiffs, and at one point it appeared that the municipal defendant would admit liability and arbitrate the issue of damages.  It has been represented to this Court that Saginaw County no longer adheres to its naked confinement policy, and therefore it has discontinued the conduct that the plaintiffs have found offensive.  However, new counsel substituted on behalf of the defendants, who now vigorously contest liability.  The defendants have filed a motion for judgment on the pleadings or in the alternative for summary judgment.  They argue that the conditions of confinement of the plaintiffs did not violate their constitutional rights because the regulations imposed on those detainees placed in administrative segregation were reasonably related to legitimate penological interests.  The County asserts that all state tort claims must be dismissed on the basis of governmental immunity.  Sheriff Charles Brown and the unnamed officers contend that they are entitled to qualified immunity on the federal claims and absolute immunity from the plaintiffs' state tort claims.

-15-

The plaintiffs likewise have moved for summary judgment. They argue that Saginaw County's naked confinement policy was unconstitutional as a matter of law, and therefore they were subjected to unreasonable and illegal conditions of confinement.

II.

A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) on the ground that the complaint does not state a cognizable claim is reviewed under the standards that govern motions brought under Rule 12(b)(6). *See* Fed. R. Civ. P. 12(h); *Ziegler v. IBP Hog Market, Inc.*, 249 F.3d 509, 511 (6th Cir. 2001); *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 11 (6th Cir. 1987). The purpose of a motion under Rule 12(b) is to test the legal sufficiency of the complaint, not the probability of success on the merits. *Ecclesiastical Order of the Ism of Am, Inc., v. Chasin,* 653 F. Supp. 1200, 1205 (E.D. Mich. 1986). In considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the allegations in the complaint are taken as true and are viewed in the light most favorable to the non-moving party. *Herrada v. City of Detroit,* 275 F.3d 553, 556 (6th Cir. 2001). The Court may consider only whether the allegations contained in the complaint state a claim for which relief can be granted. *Roth Steel Prods. v. Sharon Steel Corp.,* 705 F.2d 134, 155 (6th Cir. 1983). The motion may be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Buchanan v. Apfel,* 249 F.3d 485, 488 (6th Cir. 2001) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). However, "the complaint is not to be dismissed because the plaintiff has misconceived the proper theory of the claim, if he is entitled to any relief under any theory." *Myers v. United States,* 636 F.2d 166, 169 (6th Cir. 1981). If matters outside the pleadings must be considered in ruling on the merits of the claim, as here, the motion more properly should follow the standards and procedures of Rule 56, and

reviewing courts generally will treat the motion as one for summary judgment. *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 533 (6th Cir. 2002) (quoting *Soper v. Hoben*, 195 F.3d 845, 850 (6th Cir.1999)). The defendants have made liberal and frequent references in their motion briefs to the evidentiary record assembled through the discovery process. The Court believes, therefore, that the defendants' motion ought to be adjudicated under their alternate theory as a motion for summary judgment.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). The parties have filed cross motions for summary judgment, and neither suggests that there are facts in dispute. Nonetheless, the Court must apply the well-recognized standards when deciding cross motions; "[t]he fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate." *Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir. 2003). Thus, when this Court evaluates cross motions for summary judgment, it "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506-07 (6th Cir. 2003).

A motion for summary judgment under Fed. R. Civ. P. 56 presumes the absence of a genuine issue of material fact for trial. The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there

is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation and citation omitted).

The basic facts, recited above, are not in serious dispute. The practice of stripping naked all jail detainees placed in administrative segregation was memorialized in a formal jail policy consistently and regularly applied by Saginaw County jail personnel at the direction of the County's chief law enforcement officer. Therefore, if the policy is unconstitutional, the plaintiffs have established a case of municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658, 698 (1978) (holding that municipal liability will be found when the alleged unconstitutional act "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by the body's officers"); *see also Berry v. City of Detroit*, 25 F.3d 1342, 1345 (6th Cir. 1994) (observing that a municipality also "may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such custom has not received formal approval through the body's official decision making channels"). Since the County concedes that the individual officers acted pursuant to an established policy, it is unnecessary to pursue the plaintiffs' failure-to-train theory because that claim is simply an alternate method of establishing an unconstitutional act that was committed by the municipality itself. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989) (holding that "[t]he issue in a [failure-to-train] case . . . is whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent 'city policy'").

In addition, for the purpose of these motions the plaintiffs do not contest that probable cause existed to seize them and detain them in the jail. However, they insist that the otherwise proper seizure of the plaintiffs was transformed into an unreasonable seizure as soon as their clothes were

removed pursuant to a policy that applied to non-violent misdemeanants and did not require individualized suspicion of possession of drugs, weapons, contraband, or threat of suicide. They also assert that no legitimate purpose existed for allowing members of the opposite sex to participate in disrobing detainees, sometimes forcefully. Finally, they contend that liability should not be an issue in this case because of an alleged prior stipulation by the defendants.

A.

The question whether the defendants stipulated to liability admits of ready disposition. The plaintiffs claim that a prior attorney for the defendants agreed to admit liability and then submit the issue of damages for each individual plaintiff to facilitative mediation. Present counsel for the defendants does not subscribe to that agreement.

The plaintiffs previously filed a motion to establish liability on September 11, 2002, which the Court construed as a motion for partial summary judgment and denied. The Court found "that the plaintiffs have failed to make the required showing for summary judgment. . . . Plaintiffs' reliance on letters between counsel discussing settlement proposal is inappropriate, as such evidence would not be admissible at trial. *See* Federal Rule of Evidence 408 (barring introduction of offers to compromise). . . . At a chambers conference, [previous] defense counsel did indicate that he was inclined to admit liability and contest damages only . . . . On the current record, however, there is no basis for concluding that the facts material to a determination [of] liability are undisputed, thus entitling the plaintiffs to judgment as a matter of law." *See* October 10, 2002 Order Denying Motion to Exclude Prior Arrests and Convictions, Denying Motion to Establish Liability and Granting Motion to Amend Complaint. The plaintiffs filed a second motion to affirm the parties' stipulation

to liability on November 7, 2002, which the Court on July 3, 2003 found to be mooted by the by the plaintiffs' present motion for summary judgment.

The plaintiffs now offer numerous letters, Exs. 22 and 23 to Pls.' App., an affidavit by counsel, Ex. 24 to Pls.' App., and the following evidence regarding the issue of a stipulation by the defendants at a deposition admitting liability:

> Mr. Fletcher [plaintiffs' counsel]: Just so that I understand we have an agreement that you guys are stipulating to liability on the 1983 action only?
>
> Mr. Jensen [defense counsel]: Yes.
>
> Mr. Fletcher: Okay. And that you're going to supply that with the Court?
>
> Mr. Jensen: Yes.
>
> Mr. Fletcher: Okay. And I believe that you indicated to me, I think this should be on the record, both you, Mr. DeGrazia and also the risk manager who I believe is Ms. Kelly.
>
> Ms. Lenhart: Kelly Lenhart.
>
> Mr. Fletcher: Kelly Lenhart. That you guys all agree that that's a done deal?
>
> Mr. Jensen: Yes.
>
> Mr. Fletcher: Okay. I just want a separate record for that.

Tr. of statement (10/28/2002), Pls.' App. Ex. 26.

The primary function of a stipulation is to narrow disputes. *Leuhsler v. Comm'r of Internal Revenue*, 963 F.2d 907, 911 (6th Cir. 1992). Although stipulations waiving an issue or argument that might otherwise be tried will generally be treated as conclusive and binding, *ibid.*, the validity of a stipulation is dependant upon a clear and unequivocal expression either in writing or in open court. *See Orsini v. Kugel*, 9 F.3d 1042 (2d Cir. 1993); *but see Oliver v. City of Shattuck*, 157 F.2d

150, 153 (10th Cir. 1946) (observing that "[i]t is true that ordinarily courts will not recognize or give effect to oral agreements not made in the presence of the court or without the Court's knowledge . . . But this rule is sufficiently flexible to allow courts to give effect to oral agreements between parties, if failure to do so would allow one party to take an unconscientious advantage of his breach."). The Sixth Circuit recognizes that an oral stipulation can form the basis of an estoppel when an opposite party relies to his detriment on the representation. *See United States v. Spikes*, 158 F.3d 913, 928 (6th Cir. 1998) (stating that "[w]here one side's efforts at presenting its theory of the case is actually prejudiced by the other side reneging on its obligations under the [informal stipulation], some form of relief is appropriate"). However, there is no evidence in this case that the plaintiffs were prejudiced in the preparation of their case as a result of such reliance.

Recognizing that informal or oral stipulations can cause confusion, this District enacted a local rule to address the formal requirements of stipulations:

> **(b) Stipulations and Orders; Service of Orders.** The party initiating a stipulation and proposing an order shall submit a self-addressed stamped envelope and shall be responsible for serving copies of an order on all parties within 10 days of the date of the order, unless otherwise directed by the judge in a particular case.

E.D. Mich. LR 5.2(b). In this case, despite the deposition transcript offered by the plaintiffs, no clear and unequivocal expression of this agreement was expressed in open court; nor did the parties reduce the stipulation to a signed writing. The plaintiffs also failed to submit an order regarding the stipulation to the Court as required by E.D. Mich. LR 5.2(b). The purported stipulation, therefore, is ineffective unless the plaintiffs demonstrate that they relied upon this agreement to their detriment, which they have failed to do.

B.

The critical question in this case is whether the County's policy of removing the clothing of all detainees placed in administrative segregation violates the Constitution, since the plaintiffs have the burden when asserting a claim under 42 U.S.C. § 1983 of proving that (1) that there was a deprivation of a right secured by the Constitution and (2) that the deprivation was caused by a person acting under of color of state law. *Wittstock v. Mark A. Van Sile, Inc.* 330 F.3d 899, 902 (6th Cir. 2003). Although the defendants do not dispute that the second element has been established, they vigorously contest the plaintiffs' contention that the challenged practice violated rights under the Fourth and Fourteenth Amendments.

The seminal case dealing with the constitutionality of conditions of confinement of pretrial detainees, such as the plaintiffs in this case, is *Bell v. Wolfish*, 441 U.S. 520 (1979). There, the Supreme Court evaluated claims that certain confinement conditions (including double bunking, limitations on sources of reading material, restrictions on receipt of packages, unannounced room searches, and body cavity searches after contact visits) imposed on pretrial detainees in a federal detention facility were unconstitutional. The Court confirmed that "[t]here is no iron curtain drawn between the Constitution and the prisons of this country," *id.* at 545 (quoting *Wolff v. McDonnell*, 418 U.S. 539, 555-556 (1974)), and that "pretrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that we have held are enjoyed by convicted prisoners." *Ibid.* Constitutional rights concerning conditions of confinement, analyzed for pretrial detainees under the Due Process Clause, *id.* at n.16, however, must be balanced against the "Government['s] . . . legitimate interests that stem from its need to manage the facility in which the individual is detained." *Id.* at 540. Therefore, courts must strike a balance "between institutional

needs and objectives and the provisions of the Constitution that are of general application." *Id.* at 546 (quoting *Wolff*, 418 U.S. at 556). In striking that balance, courts must give great deference to jail administrators "in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security," *id.* at 547, lest courts become "enmeshed in the minutiae of prison operations." *Id.* at 562.

The Court in *Wolfish* set down some guiding principles to assist courts confronted with such challenges. First, for detention conditions that implicate only a detainee's liberty interests, "[a] court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id.* at 538. "[P]unitive measures . . . may not constitutionally be imposed prior to a determination of guilt." *Id.* at 537. If the measure does not constitute punishment and is reasonably related to a legitimate penological concern, then deference will be afforded jail officials unless there is "substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations." *Id.* at 548. Next, where the condition implicates the detainee's privacy interest under the Fourth Amendment, it will be upheld if it is reasonable, which assessment requires balancing the needs of the institution against the invasion of personal rights that results. *Id.* at 559. Therefore, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Ibid.*

Subsequent decisions have expanded upon and refined the factors used to detect constitutional violations resulting from conditions of confinement. The Court set forth four factors in *Turner v. Safley*, 482 U.S. 78 (1987): "First, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it. . . . [T]he

-23-

second factor . . . is whether there are alternative means of exercising the right that remain open to prison inmates. . . . A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally. . . . Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Id.* at 89-90. These factors operate as "guidelines to be weighed in the evaluation of a regulation" not prongs of a four-part test in which each prong must be met. *Whitney v. Brown*, 882 F.2d 1068, 1071 (6th Cir. 1989). The guiding principle, however, is that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89.

As noted above, the question in this case does not focus on the reasonableness of placing uncooperative and disruptive detainees in administrative segregation. Rather, the issue is whether the regulation requiring removal of all of the detainees' clothes violates the Constitution. Courts in this Circuit have recognized that prisoners have a liberty and privacy interest in shielding their naked bodies from view by others, especially members of the opposite gender. For instance, in *Cornwell v. Dahlberg*, 963 F.2d 912 (6th Cir. 1992), the court held that a prison inmate had a Fourth Amendment privacy interest that may have been violated when he was strip-searched in view of female prison guards and others after a prison uprising. In *Kent v. Johnson*, 821 F.2d 1220 (6th Cir. 1987), the court held that an inmate challenging a Michigan prison's regulation stated a Fourth Amendment claim in light of *Turner*'s four factors where he "alleged that the defendants-appellees' policy and practice of according female prison guards full and unrestricted access to all areas of the housing unit at the prison allows the female guards to view him performing necessary bodily functions in his cell and to view his naked body in the shower area." *Id.* at 1222. The court

observed that "[p]erhaps it is merely an abundance of common experience that leads inexorably to the conclusion that there must be a fundamental constitutional right to be free from forced exposure of one's person to strangers of the opposite sex when not reasonably necessary for some legitimate, overriding reason, for the obverse would be repugnant to notions of human decency and personal integrity." *Id.* at 1226. In *Johnson v. City of Kalamazoo*, 124 F. Supp. 2d 1099 (W.D. Mich. 2000), the district court held there was no Fourth or Fourteenth Amendment violation resulting from the practice of placing detainees who refused to answer an inquiry as to whether they were suicidal in a cell clad only in their underwear. However, the same court found both Fourth and Fourteenth Amendment violations under similar circumstances when the detainees were put in cells with no clothes at all. *See Wilson v. City of Kalamazoo*, 124 F. Supp. 2d 855, 862 (W.D. Mich. 2000) (observing that "the Court remains unpersuaded that society is not, as a matter of law, prepared to recognize as legitimate an inmate's subjective expectation that he may not be stripped of all clothing and covering, even for a short period of time, simply because he refuses to answer a question as to whether he is suicidal"). Most recently, the court of appeals made the following observations concerning an inmate's privacy rights in *Everson v. Michigan Dept. of Corrections*, 391 F.3d 737 (6th Cir. 2004), in which the court held that gender was a bona fide occupational qualification for Michigan prison guards:

> "Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner*, 482 U.S. at 84. "Thus, while inmates may lose many of their freedoms at the prison gate, they retain 'those rights [that are] not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration.'" *Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir. 1992) (quoting *Hudson v. Palmer*, 468 U.S. 517, 523 (1984)). Our court has recognized that "a convicted prisoner maintains some reasonable expectations of privacy while in prison, particularly where those claims are related to forced exposure to strangers of the opposite sex, even though those privacy rights may be less than those enjoyed by

non-prisoners." *Cornwell v. Dahlberg*, 963 F.2d 912, 916 (6th Cir. 1992); *see also Kent v. Johnson*, 821 F.2d 1220, 1227 (6th Cir. 1987) (assuming that "there is some vestige of the right to privacy retained by state prisoners and that this right protects them from being forced unnecessarily to expose their bodies to guards of the opposite sex"). As one of our sister circuits has explained, most people "have a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating. When not reasonably necessary, that sort of degradation is not to be visited upon those confined in our prisons." *Lee v. Downs*, 641 F.2d 1117, 1119 (4th Cir. 1981); *see also York v. Story*, 324 F.2d 450, 455 (9th Cir. 1963) ("We cannot conceive of a more basic subject of privacy than the naked body. The desire to shield one's unclothed figure from view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity.").

*Id.* at 756-57.

These well-established interests must be balanced against the defendants' asserted penological interests in evaluating the claims under both the Fourth Amendment and the Fourteenth Amendment's Due Process Clause. To assess a due process violation, the Court must accept the defendants' articulated purpose for the regulation and consider whether the regulation is an exaggerated response to the problem by applying the four factors identified in *Turner*, that is, a valid, rational connection between the regulation and the County's asserted interest put forward to justify it; whether the plaintiffs had alternative means of exercising their rights – which in this case is the right to privacy; the impact accommodation of their privacy right would have on the allocation of jail resources; and the existence of ready alternatives. *See Wolfish*, 441 U.S. at 547; *Turner*, 482 U.S. at 89-90. Under the Fourth Amendment, the Court determines whether the practice is reasonable by considering the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. *See Wolfish*, 441 U.S. at 559.

The main justification for removing the clothes of those detainees placed in administrative segregation is the prevention of suicide, although defendant Charles Brown, the county sheriff, gave

additional reasons at his deposition when he said that inmates "can obviously stuff [their clothes] down their throat, they can obviously hang themselves, they urinate on their clothing and throw it at the deputies, defecate on it and throw it at the deputies, which has been done many times, they could actually use the clothing to, if the guard got close enough, to wrap it around his neck." Defs.' Mot. for Summ. J., Ex. C, Dep. of Sheriff Brown at 62. The defendants also have offered the reports of two expert witnesses who believe that "placing a detainee for a limited duration under close supervision, in the nude, in an administrative segregation cell, is a reasonable alternative legitimately related to detention objectives." Defs.' Mot. Summ. J., Ex. E, Expert Report of Darrell Ross at ¶ 11. *See also* Defs.' Mot. Summ. J., Ex. E, Expert Report of Peter Wilson at ¶ 1 (stating that "[b]y removing their clothing, a greater degree of protection was provided to the inmates").

The Court finds, however, that confining such detainees with no clothing whatsoever is an exaggerated response to the articulated security and safety concerns of the defendants in light of the importance of the right described in this Circuit's precedents and the availability of reasonable alternatives. First, there is a rational connection between the interest of jail security and confining unruly prisoners in segregation, but that alone does not justify removing all their clothes. One of the defendants' experts states that the practice amounts to "behavior modification," Defs.' Mot. Summ. J., Ex. E, Expert Report of Darrell Ross at ¶ 11, but that purpose suggests a punitive rationale that is not permissible under the Due Process Clause. The defendants also argue that obstreperous detainees could use their clothes to assault guards, but once the detainee is in the segregation cell, that concern dissipates. Finally, the defendants offer suicide prevention as a rationale, but none of these plaintiffs were screened for suicidal tendencies, and the intake papers indicate that they were not suicide risks. Moreover, according to the defendants' expert, the "operational system" in place

-27-

included both voice and visual "officer monitoring . . . documenting security checks every 15 minutes, [and] monitoring by medical personnel." *Ibid.* There is no indication that these measures were in place in 1996 when an inmate committed suicide, and they appear to be quite adequate to ensure that a detainee is not using clothing to harm him- or herself. Further, the Saginaw County jail has a "suicide cell" available for those prisoners who truly are suicide risks. The defendants' other expert noted that "[r]emoving an inmates [sic] clothing is an extraordinary measure." Defs.' Mot. Summ. J., Ex. E, Expert Report of Peter Wilson at ¶ 5.

Second, the plaintiffs had no alternative means of exercising their right to privacy. Once their clothes were removed, they were exposed to all who could view them in the segregation cell by video monitoring device or through the slot in the door. The record indicates that some of the plaintiffs were observed naked by members of the opposite gender. They had no way to protect that "special sense of privacy in their genitals" or avoid the "especially demeaning and humiliating" experience and "degradation" resulting from the "involuntary exposure of them in the presence of people of the other sex." *Lee*, 641 F.2d at 1119.

Third, the defendants argue that allowing the detainees in the segregation cells to maintain some vestige of their modesty will result in substantially increased administrative costs. They contend that keeping disruptive and violent detainees in cells with other detainees would impact guards and other detainees; other detainees would be subject to the disruptive and violent conduct of one detainee; jail staff would be forced to focus their attention on one detainee who is violating the security and orderly operation of the jail to the necessary detriment of other detainees and to their other responsibilities; and posting one officer outside the segregation cell while one detainee is housed in the cell with his or her clothing on would place a serious strain on the resources of the jail.

Most of these arguments, however, address the practice of placing disruptive prisoners in isolation to begin with, a practice not challenged here. The plaintiffs do not contend that they should not have been taken to an isolation cell or that they should have been able to act out in the observation cell with other inmates. Nor would the practice of providing some form of bodily covering require a guard to maintain a vigil outside the isolation cell door. Rather, video monitoring, that is in use in at least some parts of the jail, likely would suffice.

The alternatives to naked confinement include those discussed in the cases cited above, such as allowing detainees to wear underwear, *Johnson*, 124 F. Supp. 2d at 1104, 1106; providing paper suicide gowns, *Wilson*, 124 F. Supp. 2d at 858; and restricting access by jail personnel of the other gender, *Kent v. Johnson*, 821 F.2d at 1222; *Everson*, 391 F.3d at 756. As mentioned above, the guards also could make use of the jail's suicide observation cell. Given the magnitude of the right to privacy in one's own body described by the cases, these rather rudimentary alternatives demonstrate the unreasonableness of the defendants' regulation and a violation of the Due Process Clause.

The policy requiring confinement in the nude also is unreasonable under the Fourth Amendment. The scope of the intrusion is substantial. The manner in which clothes are removed depends on the degree of vehemence exhibited by the detainee, but at times will include the forced removal of clothes by guards of the other gender. The justification for the extraordinary measure does not withstand scrutiny for reasons stated earlier. And the removal of clothing at times occurred in view of other jail personnel. Although the record demonstrates that isolating many of these plaintiffs was justified as a legitimate security measure because of their outrageous conduct, the Court is persuaded that society recognizes as legitimate an inmate's subjective expectation that he

-29-

or she may not be required to forfeit all clothing and covering, even for a brief time, when he or she has been detained for relatively minor violations, there is no individualized suspicion of drug, weapon, contraband possession, and there is no indication that he or she is suicidal.

The Court finds, therefore, that the plaintiffs have shown that the defendants' policy of taking all the clothing from detainees confined in administrative segregation violates the Fourth and Fourteenth Amendments of the Constitution based on the undisputed facts. They are entitled to partial summary judgment on their Section 1983 claim against the County of Saginaw.

C.

Sheriff Charles Brown and the unnamed officers also argue that they are entitled to qualified immunity on the claim filed against them in their individual capacities. Qualified immunity is an affirmative defense that protects government actors performing discretionary functions from liability for civil damages when their conduct does "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The purpose of this defense is to strike a balance that "accommodates the tension between permitting litigants to recover damages, which is often the only realistic avenue for vindication of constitutional guarantees, and the social costs of such suits, including the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004) (internal quotes and citation omitted).

The Supreme Court has held that a claim of qualified immunity must be examined in two stages, *see Saucier v. Katz*, 533 U.S. 194, 200 (2001): "[f]irst, a court must consider whether the facts, viewed in the light most favorable to the plaintiff, 'show the officer's conduct violated a

-30-

constitutional right,'" and then "the court must then decide 'whether the right was clearly established.'" *Solomon v. Auburn Hills Police Dept.*, 389 F.3d 167, 172 (6th Cir. 2004) (quoting *Saucier*, 533 U.S. at 201-02). The Sixth Circuit has expanded that inquiry into a three-step sequential analysis when the qualified immunity defense is raised in a summary judgment motion brought after discovery has been conducted, as here. "The first inquiry is whether the plaintiff has shown a violation of a constitutionally protected right; the second inquiry is whether that right was clearly established at the time such that a reasonable official would have understood that his behavior violated that right; and the third inquiry is 'whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established rights.'" *Tucker v. City of Richmond*, 388 F.3d 216, 220 (6th Cir. 2004) (quoting *Higgason v. Stephens*, 288 F.3d 868, 876 (6th Cir. 2002)); *Champion*, 380 F.3d at 901 (citing *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003)).

Once the defense is raised, the plaintiff has the burden of demonstrating a violation of a constitutional right and showing that the right was clearly established. *Barrett v. Steubenville City Schools*, 388 F.3d 967, 970 (6th Cir. 2004). Ordinarily, these questions can be answered by the court as a matter of law. *See Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996).

The Court has determined that the plaintiffs have established a violation of constitutional rights. However, the plaintiffs must also prove that the right was clearly established. The critical inquiry is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Solomon*, 389 F.3d at 173 (quoting *Saucier*, 533 U.S. at 202) (internal quotations omitted). The plaintiff need not prove that "the very action in question has previously been held unlawful," but rather "in the light of pre-existing law the unlawfulness must be apparent."

-31-

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In other words, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Ibid.*

In this case, the right to be free from unreasonable seizures is clearly established. But the qualified immunity defense requires the Court to look beyond the right in the abstract. The Supreme Court has acknowledged that "[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Saucier*, 533 U.S. at 205. Qualified immunity protects police personnel who must operate along the "hazy borders" that divide acceptable from unreasonable conduct. *Id.* at 206.

The Court finds that the contours of the right to reasonable seizures pertaining to pretrial detainees was not sufficiently clear to impose liability on individual actors following the County's policy in effect during the period at issue in this case. Issues relating to strip and body cavity searches, viewing of naked inmates by guards of the other gender, and removal of clothing from unruly detainees have troubled courts over the past several years and have not yielded a uniform set of decisions on the subject. For example, in *Hill v. McKinley*, 311 F.3d 899 (8th Cir. 2002), the court held that placing a violent female inmate in a padded cell without clothes was proper (although the defendant claimed it offered her a paper gown and she refused), but leaving her naked after she was strapped to a restraining board violated the Fourth Amendment. The court in *Kennedy v. Los Angeles Police Dept.*, 901 F.2d 702 (9th Cir. 1989), held unconstitutional the practice of performing a body cavity search on a plaintiff arrested for grand theft; but the court held the same practice constitutional in *Dufrin v. Spreen*, 712 F.2d 1084 (6th Cir. 1983). At the time of the detentions in this case, there was no clear precedent that would have provided guidance to the individual

-32-

defendants, who were attempting to walk the line between protecting detainees from harming themselves and violating their rights to personal privacy. That they transgressed that "hazy border" here will not forfeit their qualified immunity from suit.

D.

The plaintiffs also have alleged state law claims against Sheriff Brown and other unnamed officers to which the defendants claim absolute immunity under the state governmental immunity statutes. Michigan Compiled Laws Section 691.1407(5) states: "A judge, a legislator, and the elective or highest appointive executive official of all levels of government are immune from tort liability for injuries to persons or damages to property if he or she is acting within the scope of his or her judicial, legislative, or executive authority." That statute creates absolute immunity from state tort claims for the highest elected official in local government. *See Am. Transmissions, Inc. v. Attorney General*, 454 Mich. 135, 139, 560 N.W.2d 50, 52 (1997). Charles Brown, the elected sheriff of Saginaw County, falls within the ambit of Section 691.1407(5) and is therefore immune from the plaintiffs' claims under state law.

Michigan law also states that employees of a governmental unit are immune from state tort claims if "(a) [t]he officer, employee, member, or volunteer is acting or reasonably believes he or she is acting within the scope of his or her authority; (b) [t]he governmental agency is engaged in the exercise or discharge of a governmental function; [and] (c) [t]he officer's, employee's, member's, or volunteer's conduct does not amount to gross negligence that is the proximate cause of the injury or damage." Mich. Comp. Laws § 691.1407(2). The plaintiffs have named several "John Doe" defendants but they have not identified any of them. Nonetheless, there is no evidence that these

-33-

individuals were acting other than in accordance with established policy and were not grossly negligent. The individual officers, therefore, are immune from the state tort claims.

E.

In count six of their sixth amended complaint, the plaintiffs allege a claim for gender discrimination under Michigan's Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101 *et seq.*, contending that Saginaw County's detention policy is applied differently to women than to men. The defendants argue in their motion for summary judgment that there is no evidence in the record to support that claim.

The Michigan Civil Rights Act states:

The opportunity to obtain employment, housing and other real estate, and the full and equal utilization of public accommodations, public service, and educational facilities without discrimination because of religion, race, color, national origin, age, sex, height, weight, familial status, or marital status as prohibited by this act, is recognized and declared to be a civil right.

Mich. Comp. Laws § 37.2102(1). The Michigan courts have held that this legislation applies to inmates in state correctional facilities. *See Neal v. Dept. of Corr.*, 232 Mich. App. 730, 741, 592 N.W.2d 370, 376 (1998) (observing, however, that the department of corrections may "treat prisoners differently on the basis of gender without violating subsection 302(a), as long as the gender-based treatment serves important penological interests and is substantially related to the achievement of those interests"), *aff'd by special panel sub nom Doe v. Dept. of Corr.*, 240 Mich. App. 199, 611 N.W.2d 1 (2000), *remanded* 463 Mich. 982, 625 N.W.2d 750 (2001), *aff'd* 249 Mich. App. 49, 641 N.W.2d 269 (2002). However, in 1999 the Michigan legislature amended the applicable statute to state:

-34-

"Public service" means a public facility, department, agency, board, or commission, owned, operated, or managed by or on behalf of the state, a political subdivision, or an agency thereof or a tax exempt private agency established to provide service to the public, *except that public service does not include a state or county correctional facility with respect to actions and decisions regarding an individual serving a sentence of imprisonment.*

Mich. Comp. Laws § 37.2301(b) (emphasis added). The plaintiffs in this case were not serving "a sentence of imprisonment." Nonetheless, there is a serious question as to whether the legislation applies to the plaintiffs' claims.

The Court need not decide that question, however, because the defendants have alleged that the plaintiffs have not come forward with any evidence of discriminatory treatment, and the plaintiffs have not responded to that argument. Once the defendants have pointed out the deficiencies in the plaintiffs' case, it is incumbent upon the plaintiffs to come forward with evidence establishing a material fact on the issue. *Anderson*, 477 U.S. at 252. The Court is not obliged to "comb through the record to ascertain whether a genuine issue of material fact exists." *Cacevic v. City of Hazel Park*, 226 F.3d 483, 492 (6th Cir. 2000) (citing *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 407, 410 (6th Cir. 1992)). The plaintiffs have not met their burden on their state civil rights claim, and the defendants are entitled to summary judgment.

### III.

The plaintiffs have recently filed three additional motions in this case: a motion to join additional parties as plaintiffs; a motion for an order to add a damage expert to its list of witnesses; and a motion for a preliminary injunction. The defendants have filed answers in opposition to these motions. The Court has reviewed the parties' submissions and finds that the relevant law and facts have been set forth in the motion papers and that oral argument will not aid in the disposition of the

-35-

motion. Accordingly, it is **ORDERED** that the motions be decided on the papers submitted. *See* E.D. Mich. LR 7.1(e)(2).

Λ.

The plaintiffs' motion to amend the complaint to add additional parties as plaintiffs was filed December 27, 2004. They allege that in May 2003, a television report of this case resulted in contacts by other citizens to the plaintiffs' attorneys' offices, and the defendants subsequently identified one hundred other individuals who were subjected to the naked confinement policy. The plaintiffs identify eight additional individuals who wish to join this action, and they cite Federal Rule of Civil Procedure 15 as their authority to amend their complaint a seventh time for that purpose. The defendants respond that the request to add new plaintiffs comes long after the close of discovery, and that many of the prospective new plaintiffs will not be able to overcome the statute of limitations bar.

Under Fed. R. Civ. P. 15(a), a party may amend a complaint at this stage of the proceedings only after obtaining leave of court. Although the Rule provides that "leave of court shall be freely granted when justice so requires," leave may be denied on the basis of undue delay, bad faith by the moving party, repeated failure to cure defects by previously-allowed amendments, futility of the proposed new claim, or undue prejudice to the opposite party. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Duggins v. Steak 'n Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999); *Fisher v. Roberts*, 125 F.3d 974, 977 (6th Cir. 1997).

The request to amend here comes too late. The parties have engaged in extensive discovery, including deposing each of the available plaintiffs, and they have litigated summary judgment motions. Adding new parties as plaintiffs would serve to further complicate the litigation.

-36-

Moreover, if the prospective new plaintiffs cannot withstand a statute of limitations defense, allowance of the amendment would be futile. Finally, there is no reason that these new claimants cannot file a separate action of their own. The Court, therefore, will deny the motion to add new parties as plaintiffs.

B.

The plaintiffs' motion to add a damage expert to its list of witnesses effectively requires an amendment to the Case Management and Scheduling Order. The Court initially entered a scheduling order following the initial conference held pursuant to Federal Rule of Civil Procedure 16. The parties thereafter suspended their discovery activity and engaged in efforts to reach a settlement of the several claims. After the parties failed settlement efforts, the Court entered an amended scheduling order on January 28, 2003 that required the plaintiffs to file expert disclosures under Rule 26(a)(2) by February 20, 2003. The plaintiffs named three experts who were deposed by the defendants in June 2003. This request to add a new expert witness was filed on December 22, 2004. They cite no federal authority in support of their request.

The Amended Case Management and Scheduling Order in this case was entered pursuant to Rule 16(b) of the Federal Rules of Civil Procedure, which requires the court to "enter a scheduling order that limits the time . . . to file motions[] and . . . to complete discovery." Fed. R. Civ. P. 16(b)(2), (3). Once entered, "[a] schedule shall not be modified except upon a showing of good cause and by leave of the district judge." Fed. R. Civ. P. 16(b); *see also Leary v. Daeschner*, 349 F.3d 888, 906 (6th Cir. 2003). Moreover, a court may change a schedule "only 'if it cannot reasonably be met despite the diligence of the party seeking the extension.'" *Ibid.* (quoting Fed. R. Civ. P. 16, 1983 advisory committee's notes). Stated another way, "the primary measure of Rule

-37-

16's 'good cause' standard is the moving party's diligence in attempting to meet the case management order's requirements." *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 625 (6th Cir. 2002) (quoting *Bradford v. DANA Corp.*, 249 F.3d 807, 809 (8th Cir. 2001); *see also Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000) (joining the Eighth, Ninth, and Eleventh Circuits)), *cited in Leary*, 349 F.3d at 906.

The plaintiffs have offered no reason in support of their request from which the Court could find good cause. There is no suggestion that the information recently became known to the plaintiffs or that their other experts are not up to the task. The disclosure and discovery periods have closed some time ago. There is no evidence that the plaintiffs could not meet the deadlines despite their exercise of diligence. The motion, therefore, will be denied.

C.

Finally, the plaintiffs have asked the Court to issue a preliminary injunction to prohibit the defendants from enforcing their policy of removing all clothes from detainees placed in administrative segregation. Although the plaintiffs seek permanent injunctive relief in their sixth amended complaint, they have not asked for a preliminary injunction until this motion was filed on December 22, 2004. The plaintiffs have offered no facts or affidavits to support their claim, but they contend that plaintiffs' counsel has heard a report that the practice continues. They cite no authority in support of their request.

The grant of a preliminary injunction is an extraordinary remedy. *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000). When a party seeks injunctive relief, the Court should consider the following four factors: (1) the likelihood of the party's success on the merits of the claim; (2) whether the injunction will save the party from irreparable injury; (3) the probability that granting

-38-

the injunction will substantially harm others; and (4) whether the public interest will be served by the injunction. *See Rock and Roll Hall of Fame and Museum, Inc. v. Gentile Prods.*, 134 F.3d 749, 753 (6th Cir. 1998), *Six Clinics Holding Corp. v. Cafcomp Sys., Inc.*, 119 F.3d 393, 399 (6th Cir. 1997); *Frisch's Rest., Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1263 (6th Cir. 1985). The district court must make specific findings regarding each of the four factors, unless fewer factors are dispositive of the issue. *See Six Clinics Holding Corp.*, 119 F.3d at 399.

In this case, the plaintiffs' request must fail because they have not demonstrated that a preliminary injunction will save them from irreparable harm. Although the Court determines today that the defendants' policy is unconstitutional, none of the plaintiffs are confined any longer, and there is no evidence that any of them anticipate engaging in conduct that would subject them to arrest in Saginaw County. Because there is virtually no prospect on this record of the plaintiffs being subjected to placement in administrative segregation in the Saginaw County jail, they cannot, and do not, claim with any credibility that they are in danger of suffering irreparable harm even if the policy continues to be enforced. Moreover, the defendants have asserted that they no longer confine detainees in administrative segregation without offering them paper "suicide" gowns, and except for the rumor mentioned by the plaintiffs in their motion, which has no factual support, there is nothing to contradict the defendants' assertions. The motion for a preliminary injunction, therefore, will be denied.

IV.

The Court finds that there are no material facts in dispute with respect to the official policy and practice of confining Saginaw County jail detainees in administrative segregation without clothing or covering of any kind. The Court determines that this policy is unconstitutional, and the

municipality is liable under 42 U.S.C. § 1983. The individual defendants are entitled to qualified immunity for the federal claims and governmental immunity for the state law claims. The plaintiffs have not come forward with evidence to establish a material fact issue on their claims under the state civil rights act. The plaintiffs have not demonstrated a right to relief on any of their recently filed motions.

Accordingly, it is **ORDERED** that the plaintiffs' motion for summary judgment [dkt # 90] is **GRANTED IN PART and DENIED IN PART**.

It is further **ORDERED** that the defendants' motion for judgment on the pleadings or for summary judgment [dkt # 113] is **GRANTED IN PART and DENIED IN PART**.

It is further **ORDERED** that the plaintiffs' sixth amended complaint is **DISMISSED WITH PREJUDICE** with respect to defendants Charles Brown and all other individual defendants.

It is further **ORDERED** that Counts two through six of the plaintiffs' sixth amended complaint are **DISMISSED WITH PREJUDICE** in their entirety.

It is further **ORDERED** that the plaintiffs' motion to amend their complaint to add additional parties as plaintiffs [dkt # 151] is **DENIED**.

It is further **ORDERED** that the plaintiffs' motion for an order to add an expert witness [dkt # 153] is **DENIED**.

It is further **ORDERED** that the plaintiffs' motion for a preliminary injunction [dkt # 155] is **DENIED**.

It is further **ORDERED** that counsel for the parties appear before the Court for a status conference on **February 24, 2005 at 3:30 p.m.** to discuss a schedule for resolution of the remaining issues in this case.

DAVID M. LAWSON
United States District Judge

Dated:    January 25, 2005

Copies sent to:    Loyst Fletcher, Jr., Esquire
Christopher J. Pianto, Esquire
James I. DeGrazia, Esquire
Paul T. O'Neill, Esquire